## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Alfred Flowers,

               Plaintiff,

      v.

City of Minneapolis, Minnesota,
Don Samuels, in his individual and
official capacities, and Paul Ostrow,
in his individual and official capacities,
Gail Plewacki, in her individual and
official capacities, and John Does 1-5,

               Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 05-2349 ADM/JSM

---

Jill Clark, Esq., Jill Clark P.A., Golden Valley, MN, argued on behalf of Plaintiff.

James Anthony Moore, Assistant City Attorney, Minneapolis, MN, argued on behalf of Defendants.

---

## I. INTRODUCTION

On May 29, 2007, oral argument before the undersigned United States District Judge was heard on Defendants City of Minneapolis ("the City"), Don Samuels ("Samuels"), and Paul Ostrow's ("Ostrow") (collectively "Defendants") Motion for Summary Judgment [Docket No. 8]. In his Complaint [Docket No. 1], Plaintiff Alfred Flowers ("Flowers") asserts that Defendants violated 42 U.S.C. § 1983 by retaliating against him for exercising his rights under the First Amendment. For the reasons set forth herein, Defendants' Motion is granted in part and denied in part.

## II. BACKGROUND[1]

Plaintiff Alfred Flowers is a black community activist who has often criticized City officials. Flowers Decl. (Clark Decl. [Docket No. 25] Ex. 13) ¶¶ 1, 3. Flowers has produced and

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

hosted a show on the Minneapolis Television Network ("MTN").  MTN is a public access television station operating under a cable communications franchise agreement, whereby the City awarded the franchisee cable company access to certain rights of way.  Colby Aff. [Docket No. 16] ¶ 2.  In return, the cable company provides funds for the City to use for public, education, and government ("PEG") access broadcasting functions.  Id.  The City provides most of MTN's funding, which normally consists of the PEG funds the City receives plus an additional amount allocated by the City Council.  Plewacki Dep. (Moore. Aff. [Docket No. 15] Ex. 1) at 29-31.

In 2005, as a result of redistricting, incumbent City Council Members Natalie Johnson Lee and Defendant Don Samuels campaigned against each other for reelection.  Colby Aff. ¶ 4. Supporters of both candidates made frequent use of MTN to express their views.  Id.  Flowers often criticized Samuels for not adequately representing the interests of African-Americans in the City.  Samuels Aff. [Docket No. 14] ¶ 1.

In May 2005, Flowers produced and hosted a MTN broadcast of a program called the "Real State of the City."  Booker Hodges ("Hodges") also appeared on the show, which was initially broadcast on May 6, 2005.  Samuels Dep. (Clark Decl. Ex. 15) at 67.  During the program, Flowers and Hodges discussed topics such as disbursement of Federal Empowerment Zone funds to African-Americans in Minneapolis and the need for jobs for African-Americans. Clark Decl. Exs. 1, A.  Flowers and Hodges criticized the Minneapolis Civil Rights Department and the Police Community Relations Council.  Id.  They also alleged that a peace games event sponsored by Samuels' Peace Foundation was merely a public relations ploy to politically benefit Samuels.  Id.

Flowers and Hodges also expressed their opinions that Samuels failed to adequately represent African-Americans in the City.  Flowers and Hodges showed a videoclip of Samuels

discussing that his ancestors in Jamaica were slaves who served in the "big house," where they benefitted from exposure to education, music, and culture.  Id. Exs. 1 at 13, A.  Flowers and Hodges asserted Samuels' statement was offensive to many African-Americans because house slaves assisted slaveholders in disciplining field slaves.  Id. Exs. 1 at 13-14, A.  At the end of the program, Flowers and Hodges proposed solutions to the problems they identified.  Hodges made statements encouraging his viewers to gain political power through the voting process:

- To me the solution is ultimately all the things we sit here talking about, whether it be economic development, which is job creation, people like Council Member Samuels, you know it's simple.  We as a people, one in Minneapolis, have to unite and we have to learn from like Nat Turner's mistake, and we have to kill the house niggers, we gotta kill 'em, and that's what we're doing on this show, we trying to kill the house nigger, and we have to get in power.  'Cause you have to understand as long as we gotta go begging to somebody we're never going to get where we need to be.  DFL [Democratic-Farmer-Labor Party], for example, representative Ellison . . . even Council Member Samuels, the black people running over in the eighth ward City council—why would you need this party to run in your own neighborhood when you the majority?  You don't need this party.  See, black people, we have to understand and get in the right mind set, we have to get in power.  Id. Exs. 1 at 17, A at 49:35-50:42.

- I just want the community to understand as we wrap up here, the ultimate solution is we got to unify, we gotta start off by voting, vote the person, not the party, cause in our city the African-American community gets writ off because they said we don't vote, we get writ off because the ones who are active and keep they mouth shut to take the little thirty-thousand [dollars] . . . they get invited to the meeting where they allegedly speaking for us but that day is slowly coming to an end . . . because we [Flowers and Hodges] finding out too quick what they doing."  Id. Exs. 1 at 18, A at 53:08-53:43.

- [W]e just want people to get out there and help us, listen to [radio station] KMOJ . . . . [C]ontinue to watch MTN . . . and just remember the solution, you gotta get out and vote we realize we ain't gonna save everybody, but you gotta help us, you gotta get out there and vote and please if you see a house negro deal with them appropriately, call them out, do not allow these people to continue to sell us out . . . .  Id. Exs. 1 at 19, A at 55:20-56:00.

Samuels avers that he interpreted Hodges' references to "kill[ing] the house nigger,"[2] as a literal call for viewers to commit violent acts against him.  Samuels Dep. at 49-50; Samuels Aff.

---

[2] Hereinafter, these references will be referred to as "Hodges' controversial comments."

¶ 3.  On May 17, 2005, Samuels contacted the City Police Department to report that Hodges' comments might violate criminal laws.  Clark Decl. Ex. 8.  Although the responding officer informed Samuels there was insufficient evidence for a criminal prosecution, Samuels urged that the matter be referred to the City Attorney's Office for a possible criminal prosecution of Flowers and Hodges.  Id.; Samuels Dep. at 107-08.  After reviewing the matter, the St. Paul City Attorney's Office[3] declined to prosecute.

Samuels also expressed his concerns to the Mayor's office and to members of the Minneapolis City Council, including Defendant Paul Ostrow, who was then Council President. Ostrow Dep. (Clark Decl. Ex. 16) at 25-27, 50.  On or around May 17, 2005, Ostrow arranged a meeting at City Hall so Samuels could inform MTN Executive Director Pamela Colby ("Colby") of his concerns.  Id. at 52.  The meeting was attended by Ostrow, Samuels, Colby, and Kinshasha Kambui ("Kambui"), who was then a Policy Aide in the Mayor's office.  Id. at 25; Kambui Decl. [Docket No. 24] ¶¶ 4-6.  Ostrow, Samuels, Colby, and Kambui viewed portions of the Real State of the City program, including Hodges' controversial comments.  Ostrow Dep. at 61.  Samuels explained that Hodges' controversial comments constituted an actual and imminent threat to Samuels' physical safety.  Samuels Aff. ¶ 5.

Colby, Samuels, and Ostrow aver that they discussed First Amendment issues and that Samuels and Ostrow asked Colby to consider whether the Real State of the City program "crossed the line."  Colby Aff. ¶ 10; Ostrow Dep. at 54-55; Samuels Aff. ¶ 5.  Samuels, Ostrow, and Colby aver that Samuels and Ostrow did not demand that Colby discipline Flowers and Hodges for Hodges' controversial comments.  Colby Aff. ¶ 10; Ostrow Dep. at 54; Samuels Aff. ¶ 6.

_____

[3] The Minneapolis City Attorney has a conflict of interest policy to refer matters involving Minneapolis City Council Members to the St. Paul City Attorney.

Colby avers that after the meeting, she returned to her office and reviewed the Real State of the City program several times.  Colby Aff. ¶ 18.  Around this same time, Colby learned that City Communication Director Gail Plewacki ("Plewacki") had called MTN regarding Hodges' controversial comments and stated, "Do I have to remind you where your budget comes from." Bagdadi Dep. (Clark Decl. Ex. 5) at 11; Colby Aff. ¶ 15.  After reviewing the Real State of the City program, Colby suspended both Flowers and Hodges for three months from using MTN's facilities and appearing on or submitting MTN programming.  Colby Aff. ¶¶ 18, 21.  Flowers was suspended because he signed a form accepting responsibility for the content of the show.  Id. ¶ 18.

Colby avers that she independently decided to suspend Flowers and Hodges.  Id. ¶ 25. However, Kambui alleges that at the May 17 meeting, "[b]oth Samuels and Ostrow told [Colby] that, 'something has to be done.'" Kambui Decl. [Docket No. 24] ¶ 5.  According to Kambui, Ostrow and Samuels brushed aside free speech concerns.  Id.  Kambui avers "Colby made a commitment to Samuels and Ostrow that something would be done and she discussed MTN policies regarding suspension."  Id. ¶ 6.

On May 18, 2005, Colby and MTN staff member J.C. Bagdadi notified Flowers and Hodges that they were suspended.  Clark Decl. Ex. 14.  During the meeting, which was recorded, Colby informed Flowers and Hodges that Hodges' controversial comments "broke the law of the First Amendment" and that "I really have no choice because I'm just the manager of this facility and the people who are higher up than me, say[] that it has broken the law."  Id. at 1.  When asked who her superiors were, Colby referred to MTN's attorneys and its board of directors.  Id. There is no evidence of record that Colby met with MTN's attorneys or its board of directors before suspending Flowers.  Colby Aff. ¶ 18-19.

Flowers and Hodges subsequently utilized MTN's grievance procedure to appeal their

suspension. Id. ¶ 29.  On June 9 and 10, 2005, a hearing was held before a panel of MTN's

Board of Directors.  Id. ¶ 30.  The panel reversed Colby's decision to suspend Flowers and

Hodges.  Id. ¶ 32.  Flowers filed the instant Complaint on October 6, 2005.  Flowers alleges

Defendants violated 42 U.S.C. § 1983 by retaliating against him for exercising his First

Amendment rights.[4]

## III. DISCUSSION

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion

for summary judgment, the Court views the evidence in the light most favorable to the

nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere

allegations or denials, but must demonstrate on the record the existence of specific facts which

create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B.    Flowers' First Amendment Retaliation Claim

#### 1.    Whether Hodges' Comments Were Fighting Words

To prevail on his First Amendment retaliation claim under 42 U.S.C. § 1983, Flowers

must show "(1) he engaged in a protected activity, (2) the government official took adverse

---

[4] Flowers has voluntarily dismissed Gail Plewacki as a defendant, and he is no longer
pursuing his malicious prosecution and defamation claims.  Pl.'s Mem. in Opp'n to Mot. for
Summ. J. [Docket No. 23] at 22 n.6, 32.

action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004). Defendants do not dispute that Flowers has a First Amendment right to free speech on public access television. Defendants argue, however, that Hodges' comments on the Real State of the City program, when viewed in the context of previous verbal attacks Flowers made against Samuels, were constitutionally unprotected fighting words. "Fighting words" are "those [words] which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942). Stated differently, fighting words are those that are likely to cause an average addressee to fight. Buffkins v. Omaha, 922 F.2d 465, 472 (8th Cir. 1990), citing Chaplinsky, 315 U.S. at 573.

Measured by this standard, there is a question of fact whether Hodges' controversial comments were fighting words. Hodges, in reference to Samuels, stated that "we have to kill the house niggers, we gotta kill 'em, and that's what we're doing on this show, we trying to kill the house nigger, and we have to get in power." Clark Decl. Ex. 1 at 17. While Hodges' word choice was crass, "the language of the political arena . . . is often vituperative, and inexact." Watts v. United States, 394 U.S. 705, 708 (1969). "[I]n public debate . . . citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." Madsen v. Women's Health Ctr., 512 U.S. 753, 774 (1994) (quotation marks and citation omitted); see also Watts, 394 U.S. at 705, 708 (holding that draft protestor's statement that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L. B. J." was "a kind of very crude offensive method of stating a political opposition to the President").

Hodges' controversial comments must be considered in context, since verbs such as

"kill" or "destroy" are often used in a figurative rather than a literal sense.  See Time, Inc. v. Johnston, 448 F.2d 378, 384 (4th Cir. 1971) (stating that no one reading statement that Bill Russell destroyed another basketball player would conclude that speaker meant that Russell actually and literally destroyed the other player).  Considering in context all of Hodges' comments on the Real State of the City program, Defendants have failed to establish as a matter of law that Hodges' controversial comments constitute fighting words.[5]  Shortly after his controversial comments, Hodges declared "the ultimate solution is we got to unify, we gotta start off by voting, vote the person, not the party," and "just remember the solution, you gotta get out and vote . . . and please if you see a house negro deal with them appropriately, call them out, do not allow these people to continue to sell us out."  Id. at 18-19.  In light of Hodges' repeated emphasis on voting, the average viewer could have construed Hodges' controversial comments as a crude way of encouraging viewers to criticize and vote against certain City officials, such as Samuels, rather than literally kill them.  This conclusion is corroborated by the absence of evidence that Hodges' comments incited any viewers to commit violent acts against Samuels.  Whether Hodges' comments are constitutionally unprotected is a subjective judgment for a fact finder.

Arguing against this result, Defendants contend that Hodges' controversial comments must be viewed in the context of Flowers' previous verbal attacks on Samuels.  Defendants claim that Flowers previously stated that Samuels' legs would have been broken if he had

---

[5] Defendants at times use the terms "fighting words" and "illegal threats" interchangeably when referring to Hodges' controversial comments.  See Defs.' Mem. in Supp. of Mot. for Summ. J. [Docket No. 13] at 11.  However, fighting words and true threats are separate categories of unprotected speech.  Whereas fighting words tend to incite an immediate breach of the peace, true threats are statements that a "reasonable person would interpret . . . as a serious expression of an intent to cause a present or future harm."  Doe v. Pulaski County Special School Dist., 306 F.3d 616, 622 (8th Cir. 2002).  Defendants have not specifically argued that Hodges' comments were true threats, and the Court finds no basis in the record for such an argument.

spoken of his big house ancestry in another city.  Defs.' Mem. in Supp. of Mot. for Summ. J. at

2.  However, there is no evidence regarding when this statement was made or the circumstances

in which it was made.  Accordingly, Defendants have failed to show as a matter of law that

Hodges' controversial comments were constitutionally unprotected fighting words.

### 2.    Retaliatory Acts

#### a.    Inducing Flowers' Suspension

Defendants argue that even if Hodges' controversial comments were protected by the

First Amendment, there is no evidence that Defendants violated Flowers' First Amendment

rights.  Defendants contend that Colby independently decided to suspend Hodges and Flowers.

However, Kambui avers that during the meeting at City Hall, Colby committed to suspending

Hodges and Flowers as a result of pressure from Ostrow and Samuels.  Kambui's testimony

creates a genuine issue of material fact as to whether Ostrow and Samuels caused Colby to

suspend Flowers.  Suspension is an adverse action that would chill a person of ordinary firmness

from continuing to criticize City Council members on MTN.

Further, Flowers and Hodges' roles as vocal critics of Samuels during an election

campaign supports an inference that Samuels and Ostrow were motivated by a desire to chill

Flowers and Hodges' criticism.  Additionally, a jury may choose to credit Kambui's account of

the May 17, 2005, meeting, rather than Samuels and Ostrow's denial that they demanded that

Colby take disciplinary action.  The conflicting testimony on this issue creates a further genuine

issue of material fact regarding whether Ostrow and Samuels retaliated against Flowers by

causing his suspension.

#### b.    Samuels' Police Reports and Charge of Discrimination

Flowers also contends that Samuels retaliated against him in violation of 42 U.S.C. §

1983 by contacting City police on May 17, 2005, to report that Hodges' comments caused

Samuels to be concerned for his safety.  Defendants argue that imposing § 1983 liability for filing a police report that does not result in criminal charges has a chilling effect on government officials who believe they have been threatened.  Both parties cite the Supreme Court's recent decision in Hartman v. Moore, 547 U.S. 250 (2006).  The Hartman Court held that a plaintiff asserting retaliatory prosecution must plead and prove the absence of probable cause.  547 U.S. at 265-66.  The Supreme Court reasoned that where a plaintiff complains that a government official induced a prosecutor to act, a plaintiff must show a causal connection "between the retaliatory animus of one person and the action of another."  Id. at 262.  Since "[e]vidence of a [government official's] animus does not necessarily show that the [official] induced the action of a prosecutor who would not have pressed charges otherwise," the Court concluded that the absence of probable cause would serve to "link the allegedly retaliatory official to a prosecutor whose action has injured the plaintiff."  Id. at 263.

The Hartman Court did not address whether a state official can be liable under 42 U.S.C. § 1983 for retaliatory inducement of a criminal investigation where no charges are filed.  Id. at 262 n.9.  Whether the City police took "action" in response to Samuels' concern is debatable. Assuming arguendo there was an "action," Hartman still requires Flowers to show a causal connection between Samuels' alleged retaliatory animus and the actions of the City Police Department.  Under the logic of Hartman, evidence of Samuels' alleged retaliatory animus does not necessarily show that Samuels induced the City Police Department to take actions it would not have otherwise taken.  Therefore, the issue is what showing is necessary to satisfy the causal connection between Samuels' alleged retaliatory animus and any action taken by the City Police Department.

The Court finds that Flowers must show that Samuels used his position as a Council Member to induce the Police Department to take actions it would not otherwise have taken.

Flowers has not adduced any evidence on this issue.  Flowers complains that Samuels used his role as Council Member to urge a criminal prosecution against Flowers, in violation of § 1983. However, any citizen can report perceived criminal activity to the police.  The mere fact that Samuels is a City Council member does not automatically show that Samuels misused his position by filing a police report.

Flowers next argues that Samuels should be liable under § 1983 because he filed a police report when there was no probable cause for any criminal charges.  However, Flowers' argument would essentially require that government officials like Samuels make their own probable cause determination before reporting perceived threats.  This would have a chilling effect on government officials who are concerned for their safety, and there is no basis in the law for imposing such a requirement.

Flowers also argues that Samuels used his position to induce the City Police Department to refer the matter to the St. Paul City Attorney's office.  However, Flowers has not presented any evidence regarding the City Police Department's policy or custom regarding when a matter should be referred for possible prosecution.  Therefore, Flowers can not show that Samuels' position as a City Council member induced the City Police Department to take actions it would not have taken were Samuels not a City Council member.  As a result, Flowers can not rely on Samuels' May 17, 2005, police report, or the subsequent investigation, as the basis of a retaliation claim.

Flowers also argues Samuels retaliated against him in August 2005 by filing a police report alleging that Flowers had assaulted him in a City Park.  Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 14-15, 23.  However, this incident is too remote from the May 2005 Real State of the City program to support an inference that Samuels was retaliating for Flowers and Hodges' comments on that program.  Finally, Flowers argues Samuels retaliated against him by filing a

charge of discrimination against MTN with the City's Department of Civil Rights. However, there is no evidence in the record regarding the basis of Samuels' charge and its impact on Flowers. Accordingly, Flowers can not rely on Samuels' charge of discrimination as evidence of retaliation.

### 3.    Qualified Immunity

Defendants argue that even if Flowers has presented sufficient evidence of First Amendment retaliation, Samuels and Ostrow are entitled to summary judgment on the basis of qualified immunity. "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law." Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994). In Saucier v. Katz, 533 U.S. 194, 200-01 (2001), the Supreme Court clarified the standard courts must apply in conducting the qualified immunity analysis. The first question is whether, taken in the light most favorable to the plaintiff, the facts alleged show the government official's conduct violated a constitutional right. Id. at 201. This Court has found sufficient evidence that Samuels and Ostrow's conduct violated Flowers' First Amendment rights to deny summary judgment. The second question is whether the constitutional right at issue was clearly established. Id. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quotation marks and citations omitted). The Eighth Circuit applies a "flexible standard, requiring some, but not precise factual correspondence with precedent, and [application of] general, well-developed legal principles." Burton v. Richmond, 276 F.3d 973, 976 (8th Cir. 2002) (quotation marks and citations omitted).

Defendants do not dispute that Flowers' First Amendment right to free speech on public access television without facing retaliation from government officials was clearly established in

May 2005.  Therefore, the dispositive issue for Defendants' qualified immunity argument is whether a reasonable jury could find that Samuels and Ostrow violated Flowers' First Amendment rights by allegedly pressuring Colby to suspend Flowers.  The resolution of this issue turns on Samuels and Ostrow's motive.  As discussed above, there is a genuine issue of material fact regarding whether Samuels and Ostrow pressured Colby to suspend Flowers and Hodges in order to chill Flowers and Hodges' political criticism.  A reasonable government official would have known that inducing Flowers and Hodges' suspension to suppress their political criticism violated Flowers' right to free speech on public access television.  Therefore, Samuels and Ostrow are not entitled to qualified immunity.

Defendants' argument to the contrary is unpersuasive.  Defendants argue that Samuels and Ostrow could reasonably have perceived that Hodges' controversial comments were fighting words.  However, it is well established that "in public debate . . . citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment."  Madsen, 512 U.S. at 774; see also New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) (noting existence of a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials").  When considered together with Hodges' statements that citizens should "deal appropriately" with so-called house negroes by criticizing them and voting against them, a reasonable government official would have known that Hodges' controversial comments were not fighting words.  Further, eleven days had elapsed since the original airing of the program and the May 17, 2005, meeting where Samuels and Ostrow allegedly pressured Colby to suspend Flowers and Hodges.  This passage of time undercuts Defendants' argument that a reasonable government official could have concluded that Hodges' controversial comments amounted to

fighting words likely to incite an immediate breach of the peace.  Samuels and Ostrow are not entitled to summary judgment on the basis of qualified immunity.

      **4.**    <u>**Monell** Liability</u>

Flowers also asserts a § 1983 claim against the City.  The Supreme Court in <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658, 694 (1978), held that local governments are not liable under § 1983 for injuries inflicted solely by their employees or agents.  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  <u>Id.</u>

Flowers has not identified any specific City policy that caused his suspension.  Instead, he argues that Ostrow, Samuels, and Plewacki (who allegedly threatened MTN's funding), were chief policymakers and therefore the City is liable for their conduct.  "Municipal liability may attach based on the single act or decision of a municipal decisionmaker if the decisionmaker possesses final authority to establish municipal policy over the subject matter in question." <u>Speer v. City of Wynne</u>, 276 F.3d 980, 987 (8th Cir. 2002).  Flowers has not presented any evidence that Samuels, Ostrow, or Plewacki had final authority to establish City policy regarding the City's relationship with MTN.  Instead, evidence in the record shows that the City Council has final authority to establish City policy and funding regarding MTN.  Despite Flowers' speculative assertions, nothing in the record evidences the City Council's sanction of the conduct of Ostrow, Samuels, or Plewacki in allegedly pressuring Colby to suspend Flowers and Hodges. Therefore, Flowers can not show that Samuels, Ostrow, and Plewacki were final policymakers for the City.

Flowers also conclusorily asserts that "the City did nothing to control its high-ranking officials."  Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 32.  Presumably Flowers is claiming that

the City had an official custom that allowed City officials to violate First Amendment rights of citizens who criticized City officials.  To establish the existence of a municipal custom, a plaintiff must satisfy three requirements:

1.      The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2.      Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct;

3.      The plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citation omitted).  Since Flowers has not addressed how these elements are satisfied, Flowers can not survive summary judgment on any of his theories of Monell liability.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.       Defendants City of Minneapolis, Don Samuels, and Paul Ostrow's Motion for Summary Judgment [Docket No. 8] is **GRANTED** regarding the City, **AND DENIED** as to Defendants Ostrow and Samuels; and

2.       Defendants City of Minneapolis, Gail Plewacki, and John Does 1-5 are **DISMISSED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 6, 2007.